UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELLI HAYWARD, an individual,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA, N.A.,<br><br>Defendant. | No. 2:16-cv-03047-MCE-DMC<br><br><br>**ORDER** |

Through the present lawsuit, Plaintiff Kelli Hayward ("Plaintiff") seeks damages against her mortgage servicer, Defendant Bank of America, N.A., ("BANA") on grounds that BANA wrongfully withheld payments received from Plaintiff's insurance carrier following a 2013 fire loss and failed to credit those retained funds against the outstanding balance owing on Plaintiff's mortgage loan. Plaintiff's operative First Amended Complaint ("FAC") asserts ten claims against BANA: 1) violation of the federal Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"); violation of California's Rosenthal Act, Cal. Civ. Code §§ 1788, et seq.; 3) negligence; 4) invasion of privacy; 5) breach of contract; 6) conversion; 7) quiet title; 8) intentional infliction of emotional distress; 9) violation of California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq. ("CLRA"); and 10) violation of California Consumer Credit

1

Reporting Agency Act, Cal. Civ. Code §§ 1788, et seq. ("CCRAA"). Federal question jurisdiction is premised on Plaintiff's TCPA claim pursuant to 28 U.S.C. § 1331.

Presently before the Court is Defendant BANA's Renewed Motion for Summary Judgment, or in the alternative Partial Summary Judgment. ECF No. 49. As set forth below, that Motion is GRANTED in part and DENIED in part.[1]

## BACKGROUND

On January 22, 2009, Plaintiff obtained a mortgage loan in the amount of $251,000 for the purchase of residential real property located at 14636 Cloverdale Road in Anderson, California ("property"). That purchase was memorialized in a Promissory Note ("the Note") and secured by a Deed of Trust. Def.'s Stmt. of Undisputed Facts ("SUF"), No. 1. Defendant BANA has at all relevant times been the beneficiary and servicer of Plaintiff's loan, with full authority to enforce the terms of the Note and Deed of Trust. Id. at No. 2.

Plaintiff regularly missed payments on her mortgage beginning in 2009, and no payment on the loan has been made since September of 2012. Id. at No. 3. In September 2013, Plaintiff's property was destroyed as a result of the so-called Clover Wildfire. Id. at No. 5, FAC, ¶ 21. In the aftermath of the fire, Plaintiff hired a third-party loss adjuster, Greenspan Company Adjusters International ("Greenspan") to assist with her insurance claims in exchange for a guaranteed payment to Greenspan of ten percent of all insurance proceeds recovered on her behalf.

The Deed of Trust both required Plaintiff to insure the property and, in the event of a loss, to direct any insurance payment to BANA. The Deed of Trust further permitted, BANA, at its option, to apply any such insurance proceeds "**either** (a) to the reduction of

///

---

[1] Having determined that oral argument would not be of material assistance, the Court submitted this matter on the briefs in accordance with E.D. Local Rule 230(g).

the indebtedness. [ …], **or** (b) to the restoration or repair of the damaged Property." SUF at No. 6.

On or about November 1, 2013, Plaintiff received two property claim insurance payments from Nationwide, the casualty insurer for her property. Those two checks totaled $501,389.50 and were made jointly payable to Plaintiff, BANA, and Greenspan. SUF at No. 7. Plaintiff claims that she had previously requested a payoff quote because she wanted to curtail the mortgage, and that on or about November 25, 2013, she went in person to BANA's Redding, California branch to do so. According to Plaintiff, she was told that payment could not be made at the branch. Plaintiff states that a branch employee helped her send both checks to the "proper department," presumably BANA's mortgage servicing division. Pl.'s Decl., ECF No. 59-1, ¶¶ 10, 12.[2] According to Plaintiff, both she and Greenspan had endorsed the checks. See Pl.'s Dep., Ex. A. to Decl. of David S. Reidy, 104:8-15.

According to BANA, when it contacted Plaintiff on November 26, 2013, about what she intended to do with the property, she indicated she planned to rebuild. SUF at No. 9; see Parker Decl., ECF No. 35-5, ¶ 24, Ex. 7. While Plaintiff denied at deposition that she had made any definitive decision in that regard, even she conceded that she was considering rebuilding. Pl. Dep., 133:21-23.

Although the decision on how to apply the proceeds was ultimately one for BANA to make under the terms of the Deed of Trust, at a minimum it needed to determine what the mortgagee, here Plaintiff, wanted to do. Given Plaintiff's stated desire to rebuild, it is undisputed that BANA sent Plaintiff a letter on November 26, 2013, the same day its representative spoke to Plaintiff, with a waiver and release of lien for each prospective contractor to sign in order for BANA to release funds to rebuild. SUF at No. 10.

---

[2] Defendant BANA has filed various objections to Plaintiff's Declaration, as well as to certain exhibits submitted by Plaintiff in opposing its motion. ECF No. 61-1. To the extent that this Memorandum and Order relies on any portion of Plaintiff's Declaration to which objections are interposed, or cites exhibits subject to objection, those objections are overruled. Otherwise, the Court need not rule upon matters upon which its decision does not rest and it accordingly declines to rule upon the remainder of BANA's objections.

3

After five unsuccessful attempts to reach her by telephone (id. at No. 12) concerning the status of the retained insurance funds, BANA finally reached Plaintiff on January 3, 2014, and told her she could either (a) provide a signed letter of intent requesting that the insurance proceeds be applied to pay down her mortgage debt, along with a release of interest by Greenspan; or (b) submit documents from a contractor, including a W9 form, so that BANA could disburse funds for Plaintiff to use in rebuilding. BANA's records indicate that during the January 3, 2014 call, Plaintiff again reiterated that she wanted to rebuild, explaining that demolition had just been completed and that she just needed to choose a contractor among several she had in mind. Id. at No. 13.

While awaiting further word from Plaintiff, BANA issued a check to Plaintiff on January 7, 2014 in the amount of $212,962.17, made payable to Plaintiff and to Greenspan, which represented the excess proceeds over the balance owing on Plaintiff's loan at that time. Plaintiff used those proceeds to purchase a new property in Redding. Id. at Nos. 14-15.

On January 14, 2014, a BANA representative spoke to Plaintiff and explained to her both why it had remitted the excess insurance proceeds and why it was holding the remainder pending Plaintiff's directive. BANA told Plaintiff to call 7-10 days before funds were needed for the rebuild so that an inspection could be ordered and additional funds released pending the outcome of that inspection. Id. at No. 16. Thereafter, on January 27, 2014, Plaintiff told BANA that she was still doing groundwork for rebuilding and that she did not have any timetable as to when work might be completed. Id. at No. 17.

After hearing nothing from Plaintiff for some months, BANA called Plaintiff again on December 9, 2014, inquiring again about the status of repairs. That same day, BANA sent Plaintiff a letter stating that it had not received an update concerning the progress of any work performed, confirming that BANA was holding some $288,437.13 in insurance

///

4

proceeds, and asking Plaintiff to call BANA to schedule an inspection if work had been performed and disbursements were needed. Id. at No. 18.

Although Plaintiff had still failed to notify BANA what she wanted done with the proceeds, a law firm representing Plaintiff wrote to BANA on February 20, 2015, objecting to BANA's continued mortgage billings on the property. Reidy Decl., Ex. E. Thereafter, BANA again tried to make follow-up contact with Plaintiff on March 25, 2015 about the status of any repairs, and during that call Plaintiff claimed, apparently for the first time, that "I paid that house off." SUF at No. 19. BANA informed Plaintiff that was not the case and asked whether she had sent a letter of intent to pay off the loan, which Plaintiff could not recall. BANA asked Plaintiff to check whether any such document had indeed been submitted. Id.

On July 30, 2015, BANA again attempted to contact Plaintiff to ascertain her intentions as to the use of the remaining insurance proceeds. BANA also sent a letter to Plaintiff the same day confirming that it was holding those proceeds pending further word from her. Thereafter, on August 6, 2015, August 25, 2015, and March 8, 2016, BANA followed up with Plaintiff about what next steps would be taken as to the proceeds. Id. at Nos. 21-22.

In the meantime, Plaintiff had made no payments on her technically outstanding loan, causing BANA to eventually pursue foreclosure proceedings in March of 2016. In addition to unpaid monthly payments, Plaintiff's balance due swelled due to interest and penalties, as well as charges for insurance, maintenance and inspection as levied by BANA.

Even in the face of these foreclosure proceedings it is undisputed that BANA still attempted to ascertain just what Plaintiff wanted to do. On June 6, 2016, BANA sent another letter to Plaintiff advising her that it had still not received the required letter of intent from Plaintiff to apply the insurance proceeds towards her mortgage loan, if that was what she desired. BANA further counseled Plaintiff that it had not received a release of interest from Greenspan, either. BANA advised Plaintiff that both the letter of

intent and release from Greenspan were required if she wanted the proceeds applied to her loan.[3]  Id. at No. 23.

BANA tried to contact Plaintiff by telephone on at least three additional occasions between August 16, 2016, and December 8, 2016, in order to ascertain her intention concerning the remaining insurance proceeds.  Id. at Nos. 24-25.  BANA also sent Plaintiff another letter on December 8, 2016, advising her that if she indeed wanted to rebuild she needed to supply various documents before funds could be released for that purpose.  Id. at No. 26.

Plaintiff never provided BANA with the documentation it asked for to either apply the funds to reduce the debt owing on her mortgage or to disburse funds to rebuild.  Id. at No. 27.  Instead, Plaintiff filed the present lawsuit on December 29, 2016.

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic

---

[3] The fact that Greenspan was entitled to a ten percent cut of any insurance payment, and that Plaintiff had informed BANA that she planned to rebuild, justified the need for waiver and release documents be provided before insurance proceeds could be released.

6

Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.  In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original).  As the Supreme Court explained, "[w]hen the moving party has carried its burden under

Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. at 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

**A. BANA Did Not Improperly Withhold Plaintiff's Insurance Proceeds**

Plaintiff's Fifth Claim for Relief for breach of contract, her Sixth Claim for conversion, her Seventh Claim for quiet title, and her Tenth Claim for violation of California's CCRAA all rely on the assertion that BANA improperly failed to apply the insurance proceeds to pay down Plaintiff's mortgage. See FAC, ¶¶ 75-77, 82, 87. The Court finds that argument to be misplaced.

Plaintiff alleges that BANA breached the Deed of Trust by withholding the insurance proceeds and attempting to collect money Plaintiff did not owe. FAC, ¶¶ 75-77. Under the terms of the Deed of Trust, however, BANA was under no obligation to apply the insurance proceeds to Plaintiff's outstanding loan balance. As indicated above, that instrument gives BANA the right, at its option, to apply funds either to reduce the indebtedness or to restore or repair the property. SUF No. 6, Ex 2, ¶ 4. By issuing payment on January 7, 2014, for the $212,952.17 exceeding the amount required to pay off Plaintiff's mortgage loan, BANA complied with its obligations under the Deed of Trust,

which requires that "any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto." Id. at Ex. 2, ¶ 4.

With respect to the remaining insurance proceeds, it is undisputed that Plaintiff neither rebuilt the property nor provided the documentation requested by BANA in order to release funds. While conceding that point, Plaintiff nonetheless claims the funds should have been used to pay down her loan. FAC, ¶ 76. The evidence is also clear, however, that Plaintiff never made a formal request in that regard. Although Plaintiff alleges she thought by sending the insurance checks to BANA she had paid off the mortgage, the record shows that BANA advised her on multiple occasions after receiving those checks that she had to make a formal election to either rebuild or to pay off the mortgage, and she did neither. Moreover, while Plaintiff claims she went into BANA's Redding branch on November 25, 2013, with the intention to use the insurance proceeds to pay off her loan (see Pl.'s Decl., ¶ 12), it is undisputed that she told BANA the very next day that she planned to rebuild. SUF at No. 9.

Even more significantly, after March 25, 2015, when Plaintiff appears to have advised BANA for the first time that she believed her loan had been paid off (SUF No. 19), BANA has demonstrated that it repeatedly informed Plaintiff about the steps she needed to take to apply the insurance proceeds to her mortgage debt. See, e.g., SUF Nos. 10, 11, 13. It is undisputed that Plaintiff did nothing in the face of that advice.

Because BANA had the right under the Deed of Trust to make the ultimate decision on the disposition of insurance proceeds, because BANA complied with the requirements of the Deed of Trust by releasing funds in excess of Plaintiff's mortgage indebtedness to her, and because Plaintiff herself failed to take the steps necessary to direct how the funds should be applied, there can be no breach of contract on BANA's part. See, e.g., Carma Developers, Inc. v. Marathon Dev. California, Inc., 2 Cal. 4th 342, 374 (1992) ("[I]f defendants were given the right to do what they did by the express provisions of the contract there can be no breach."); Cal. Civ. Code § 1644. Having

9

failed to establish the essential elements of a breach of contract claim BANA is therefore entitled to summary judgment as to Plaintiff's Fifth Claim for Relief.[4]

Like her breach of contract claim, Plaintiff's Sixth Claim for Relief for conversion also alleges that BANA improperly withheld Plaintiff's insurance proceeds. As BANA points out, however, in order to sustain a cause of action premised on conversion, Plaintiff must prove 1) her right to possession of the property at issue; 2) BANA's conversion by a wrongful act or disposition of property rights; and 3) damages. Lee v. Hanley, 61 Cal. 4th 1225, 1240 (2015). As indicated above, it is undisputed that BANA distributed all excess insurance funds to Plaintiff in January 2014 and that she had no right under the terms of the Deed of Trust to possession of the remaining funds, particularly where she did nothing to direct disbursement of those funds even after being repeatedly asked by BANA to do so.

Provisions similar to those permitting BANA to hold the funds pursuant to the Deed of Trust have been upheld by numerous courts. See, e.g., Hopkins v. Wells Fargo Bank, N.A., 2013 WL 2253837 at * 10 (E.D. Cal. 2013) (holding that plaintiff lacked the right to possess insurance proceeds tendered to a bank pursuant to the deed of trust); Wells Fargo Bank, N.A. v. Kuhn, 2015 WL 12655702 at * 1 (C.D. Cal. 2015) (because borrower had no right to possess insurance proceeds under deed of trust, summary judgment in favor of bank on conversion claim was granted). Because Plaintiff lacked the fundamental right to possession of the insurance proceeds under the circumstances here, she cannot establish a viable claim for conversion.

Plaintiff's quiet title cause of action, as alleged in her Seventh Claim for Relief, similarly alleges that Plaintiff had paid off her mortgage loan, despite the fact that the undisputed evidence shows she did not. As indicated above, Plaintiff not only lacked the right under the Deed of Trust to direct how funds should be applied, she also failed to

---

[4] Plaintiff's argument that disputed facts arise because of BANA's "alleged history of shady business practices," and the contention that any decision on its part to hold Plaintiff's funds for a rebuild was not made in good faith, is no more than speculation under the facts of this particular case. Plaintiff cannot create a material issue of disputed fact through speculation alone and Plaintiff's allegations in that regard cannot carry the day.

10

take the steps required for BANA to accede to her request to either rebuild or curtail the loan. The evidence shows that even after Plaintiff claims she sent the insurance checks to BANA with the purported request that her loan be paid, she continued to express the desire to rebuild, and was advised on numerous occasions how the withheld funds could be released for that purpose. Moreover, after Plaintiff failed to take any action on that front, it is equally clear that BANA told her both repeatedly and unequivocally that she needed to submit an election to pay off the loan, as well as a release of any lien on Greenspan's part since Greenspan was also included as a payee on the insurance disbursements.

Under those circumstances, Plaintiff cannot realistically claim that she paid off the mortgage when she took no action in response to BANA's requests. Because she has therefore not paid the mortgage, she is not entitled to "quiet title" as to the property. Miller v. Provost, 26 Cal. App. 4th 1703, 1707 (1994) ("a mortgagor of real property cannot, without paying his debt, quiet his title against the mortgagee"); Leonard v. Bank of America, 16 Cal. App. 2nd 341, 342-43 (1936) ("it is settled in California that a mortgagor cannot quiet his title against the mortgagee without paying the debt secured."). BANA is accordingly entitled to summary adjudication as to Plaintiff's quiet title claim.

Finally, Plaintiff's Tenth Claim for Relief, which alleges a CCRAA violation, also depends on the assertion that Plaintiff had paid off her loan with BANA, and that BANA's reporting of the loan as past due was accordingly unlawful. The CCRAA prohibits a person from "furnish[ing] information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate." Cal. Civ. Code § 1785.25; see Carvalho v. Equifax Information Servs., LLC, 629 F.3d 876, 890-91 (9th Cir. 2010) (reported information is inaccurate or incomplete if it is "patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions.").
///

11

Again, because Plaintiff cannot establish that she paid off the loan, and because it is undisputed that Plaintiff made no payments on the loan following the fire, she cannot show that BANA's credit reporting was inaccurate. While Plaintiff may argue she should not have been expected to make payments given BANA's retention of a sum at least initially sufficient to pay off her loan entirely, the fact remains that it was entirely within Plaintiff's power to take action to avoid being placed in any sort of credit predicament, and it is undisputed that she did nothing despite repeatedly being advised by BANA of the steps she needed to take to have the loan paid. There can be no viable CCRAA claim under those circumstances any more than a credible claim for either breach of contract, conversion or quiet title can be established. BANA's request for summary judgment as to Plaintiff's Tenth Claim for Relief is thus also GRANTED.

### B. Plaintiff Cannot Maintain a CLRA Claim

Plaintiff's Ninth Claim for Relief alleges that BANA violated California's CLRA by sending "erroneous statements and demands for payment." FAC, ¶ 93. Plaintiff also claims that BANA took deceptive actions in servicing her loan, including assessing interest and late fees when none was due, as well as charging Plaintiff for homeowner's insurance, property repairs, and inspections and photos, among other things. Id. at ¶ 95.

Despite these allegations, Plaintiff's CLRA claim fails for the simple reason that the statute has been held not to apply to mortgage loans. Instead, it "only applies with respect to 'transactions[s] intended to result of which result[] in the sale or lease of goods or services to [a] consumer . . . '" Alborzian v. JPMorgan Chase Bank, N.A., 235 Cal. App. 4th 29, 40 (2015) (quoting the CLRA at Cal. Civ. Code § 1770(a)).

The law is well settled that the CLRA does not apply to either mortgage loans or to ancillary services related to such loans. Palestini v. Homecomings Financial, LLC, 2010 WL 3339459 at * 11 (S.D. Cal. 2010) (the CLRA is inapplicable to mortgage loans and related ancillary services); Consumer Solutions REO, LLC v. Hillery, 658 F. Supp. 2d 1002, 1015-17 (N.D. Cal. 2009) (same). In claiming otherwise, Plaintiff alleges that "BANA engaged in providing services to Plaintiff while it renegotiated,

12

evaluated, and awarded Plaintiff loan modifications," relying, inter alia, on Hernandez v. Hilltop Fin. Mortg. Inc., 622 F. Supp. 2d 842, 851 (N.D. Cal. 2007). While Plaintiff did receive loan modifications from BANA during the 2010-2012, those activities predate the events giving rise to this lawsuit and do nothing to support Plaintiff's CLRA claim here. Hernandez therefore does nothing to support Plaintiff's CLRA claim.

Plaintiff's Ninth Claim for Relief accordingly cannot be maintained, and BANA is entitled to summary judgment as to that claim.

### C. Plaintiff's Rosenthal Act Claim Survives Summary Judgment

In support of her Second Claim, for violation of California's Rosenthal Act, Plaintiff alleges that BANA made harassing calls to Plaintiff and in so doing used false and unconscionable means to collect or attempt to collect the purported debt. FAC, ¶¶ 44-46. Plaintiff estimates that BANA made "well in excess of one thousand calls" to her two cell phone numbers, even after she asked BANA to stop on "many" occasions. Id. at ¶¶ 33, 36.

Under the Rosenthal Act, "every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of Sections 1692b to 1692j" of the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 et seq. Civ. Code § 1788.17. Under Section 1692d, "[a] debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt," including, at subsection (5), "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number." By expressly incorporating the standard under the federal FDCPA in defining liability for the same conduct under state law, the scope of both statutory schemes appears coextensive and the same analysis in assessing liability under the FDCPA also applies to the Rosenthal Act. See Joseph v. J.J. MacIntryre Cos., LLC, 238 F. Supp. 2d 1158, 1168 (N.D. Cal. 2002).

///

13

As indicated above Plaintiff's FAC shows that she bases this Rosenthal Act claim on allegations that BANA engaged in excessive calling even after she requested that such calls stop. BANA, on the other hand, claims Plaintiff has failed to establish any actionable misconduct of this nature on its part, let alone misconduct occurring within the applicable limitations period.

The Rosenthal Act carries a one-year statute of limitations. Cal.Civ. Code § 1788.17. According to BANA, any conduct preceding one year prior to the date Plaintiff's lawsuit was filed on December 29, 2016 is therefore time-barred. BANA goes on to argue the no evidence of misconduct falling within the purview of that limited statutory period has been identified. This effort on BANA's part to minimize its potentially actionable conduct under the Rosenthal Act, however, ignores the fact that the Act's statute of limitation may be extended through the so-called "continuing violation" doctrine. As the court in Komarova v Nat. Credit Acceptance, Inc., 175 Cal. App. 4th 324 (2009), noted, violations occurring over a continuing course of harassing phone calls are not barred by the statute of limitations. Id. at 343-44; see also Joseph v. J. J. Macintyre Companies, LLC, 281 F. Supp. 2d 1156, 1161 (N.D. Cal. 2003) (applying the continuing violation doctrine in a Rosenthal Act action where repeated harassing phone calls occurred as well as a single call late at night).

The case law provides no clear guidance with respect to how many calls are needed for a defendant's conduct to constitute "harassment" under the Rosenthal Act. See Crockett v. Rash Curtis & Assocs., 929 F. Supp. 2d 1030, 1032 (N.D. Cal. 2013) ("No bright-line rule guides courts in determining which conduct fails to establish harassment as a matter of law, but courts have found call volumes similar to the 22 at issue here to state a claim for relief . . . ")

With these general principles in mind, the Court turns to the case at hand. There is a sharp divergence in how the parties characterize the calls. The operative FAC, as indicated above, suggests that more than a thousand calls were made by BANA in attempting to collect its debt. FAC , ¶¶ 33, 36. According to Plaintiff, BANA called her

14

repeatedly until 2016, to the extent that she stopped answering her phone entirely due to the frequency of the calls. Plaintiff claims she eventually secluded herself at home "due to the stress of BANA's endless harassment." Pl.'s Decl., ¶¶ 20, 24. If Plaintiff is given the benefit of the doubt with respect to those claims, as summary judgment principles would appear to mandate, the Court cannot rule out a pattern of harassment triggering applicability of the "continuing violation" doctrine. If the Court does that, BANA's collection attempts going back to its very first collection efforts after Plaintiff failed to make a disbursement election one way or the other have to be considered. Since the evidence shows that BANA was operating from the onset with the assumption that Plaintiff wished to rebuild and that accordingly the remaining insurance funds were to be reserved for that purpose,[5] one would expect that collection calls may well have started sometime in early-to-mid 2014.[6]

Perhaps tellingly, BANA has not offered any evidence as to either when the calls started or how frequently they were at the onset. From counsel's letter of May 15, 2019 (Reidy Decl., Ex F), we only know that BANA placed some 51 calls (and 42 apparent voice mail messages) to Plaintiff at her cell phone ending in -2448 between October 6, 2015 and December 1, 2016, and three calls to the -8550 number between November 4, 2014 and May 3, 2016. Even aside from the fact that those records are no doubt incomplete with respect to BANA's post-fire collection activities, whether or not that volume of calls is harassing raises triable issues not amenable to determination on summary judgment.

In addition, whether or not Plaintiff consented to the calls also raises triable issues. It is undisputed that Plaintiff had initially consented to being called at both of her

---

[5] As indicated above, BANA's call logs indicate that Plaintiff had initially reiterated on several occasions that her intent was to rebuild, and it was not until March of 2015 that she gave any firm indication otherwise when she told BANA she thought she had already "paid off" the property.

[6] It also bears noting that Plaintiff was in default on her mortgage with BANA even before the Clover fire destroyed her residence. BANA's records indicate she had made no payments for a full year beforehand (SUF at No. 3), which make the likelihood of calls at a date closer to the September 2013 fire even greater.

15

cell phone numbers in connection with pre-fire loan modification requests.  See SUF Nos. 31, 33.  Plaintiff claims, however, that at various points between November 2013 and June of 2014, she requested that BANA stop contacting her with respect to her mortgage loan given her belief that she had already "paid it off" in November 2013.  Pl.'s Decl., ¶ 16.  In addition, Plaintiff's counsel sent a cease and desist letter to BANA on February 20, 2015, demanding that BANA "immediately cease and desist all collection activity."  See Reidy Decl., Ex. E.  While BANA claims that this language is not specific enough to revoke Plaintiff's prior consent, at a minimum there is a triable issue of fact given both the letter and Plaintiff's own assertions that she had repeatedly asked BANA not to call.  Therefore, to the extent that BANA continued calling thereafter, the Court cannot foreclose liability under the Rosenthal Act.  Indeed, it was not until after a December 6, 2016, phone call wherein Plaintiff requested that BANA stop calling her on her cell phone that it is undisputed that no further phone calls from BANA were made.  SUF at Nos. 37, 38.

In sum, there are too many unanswered questions, and potential factual issues, for this Court to grant summary adjudication as to Plaintiff's Rosenthal Act claims.  BANA's request for summary judgment as to Plaintiff's Second Claim for Relief is accordingly DENIED.

### D. Plaintiff's Negligence Claim Fails

It is axiomatic that a negligence claim requires "a legal duty to use reasonable care."  See Mendoza v. City of L.A., 66 Cal. App. 4th 1333, 1339 (1998).  The stated basis of Plaintiff's Third Claim for Relief, which alleges negligence, is that BANA "owed a duty to Plaintiff with regard to the manner of debt collection practices," which BANA allegedly breached when it tried to collect on Plaintiff's loan.  FAC, ¶¶ 63-64.

The problem with this argument is that a loan servicer owes no duty to the borrower of the loan it is servicing.  Castaneda v. Saxon Mortg. Servs., 687 F. Supp. 2d 1191, 1198 (E.D. Cal. 2009).  More generally, "in the context of negligence suits, debt

///

collectors do not owe a duty of care to debtors in the collection of consumer debts." Montegna v. Ocwen Loan Servicing, LLC, 2017 WL 4680168 at * 11 (S.D. Cal. 2017).

It is undisputed that BANA's acts directed to Plaintiff were made in its capacity as the servicer of Plaintiff's mortgage. See SUF No. 2. While courts in some contexts have recognized an exception to the general rule barring negligence claims where a servicer acts wholly outside its customary role in servicing the role, no such evidence is present here. To the extent that Plaintiff relies on cases imposing a duty of care on lenders in the context of loan modification reviews, for example, those cases are inapposite since this case does not hinge on any such modification. See, e.g., Jolley v. Chase Home Finance, LLC, 213 Cal. App. 4th 872 (2013); Alvarez v. BAC Home Loans Servicing, L.P., 228 Cal. App. 4th 941 (2014). Summary judgment as to Plaintiff's negligence claim is therefore proper.

### E. BANA did not Violate Plaintiff's Right to Privacy

In her Fourth Claim for Relief, Plaintiff contends that BANA intruded upon her reasonable expectation of privacy by calling her to collect a debt she did not owe. FAC, ¶ 69. To establish an invasion of privacy claim, however, Plaintiff must prove that BANA intentionally "intrud[ed] into a private place, conversation or matter . . . in a manner that is highly offensive to a reasonable person." Marseglia v. JPMorgan Chase Bank, 750 F. Supp. 2d 1171, 1176 (S.D. Cal. 2010) (quoting Taus v. Loftus, 40 Cal. 4th 683, 725 (2007).

Plaintiff offers no opposition to BANA's claim that the circumstances of this case demonstrate, as a matter of law, that no "offensive" communications have been identified that give rise to an actionable claim for invasion of privacy. BANA's request for summary adjudication as to Plaintiff's Fourth Claim for Relief is therefore proper and will be GRANTED.

///

///

///

### F. Plaintiff's Intentional Infliction of Emotional Distress Claim Fails in the Absence of any Extreme or Outrageous Conduct

In Support of her Eighth Claim for Relief for Intentional Infliction of Emotional Distress ("IIED"), Plaintiff alleges that BANA "acted with extreme and outrageous conduct by attempting to collect on a loan that was paid in full, initiating foreclosure proceedings against the Property, and continuously calling and harassing Plaintiff." FAC, ¶ 89. To establish a viable claim for IIED, Plaintiff must show 1) extreme and outrageous conduct by BANA with the intention of causing, or reckless disregard of causing emotional distress; 2) Plaintiff's severe or extreme emotional distress as a result; and 3) actual and proximation causation of that distress by BANA's outrageous conduct. Cervantes v. J.C. Penney, 24 Cal. 3d 579, 593 (1979). To be actionable, the conduct in question have been "so extreme as to exceed all bounds of that usually tolerated in a civilized community." Davidson v. City of Westminster, 32 Cal. 3d 197, 209 (1982).

The Court agrees with BANA that no such conduct has been identified here. To the contrary, BANA's contacts with Plaintiff appear to have been within the scope of ordinary loan servicing. Even if BANA's collection activities were upsetting to Plaintiff, they do not support a claim for IIED. See Farrell v. Boeing Employees Credit Union, 2017 WL 446888 at * 2 (N.D. Cal. 2017) (dismissing IIED claim based on wage garnishment, finding that such conduct could not be deemed outrageous). As the Farrell Court noted, "[d]ebt collection, but its nature, causes the debtor emotional distress; however, such conduct is only outrageous if it goes beyond all reasonable bounds of decency." Id.

In opposition, Plaintiff does not dispute the applicability of this standard. She simply alleges that state law standards for proving the severity of her emotional distress damages should not apply, citing cases holding to that effect in the context of claims arising under the FDCPA. See, e.g., Alonso v. Blackstone Financial Group LLC, 962 F. Supp. 1188, 1201 (E.D. Cal. 2013); Nelson v. Equifax Information Servs.,

522 F. Supp. 2d 1222, 1235 (C.D. Cal. 2007). That does not address the fundamental question of whether "outrageous behavior" exceeding "all bounds of that usually tolerated in a civilized community" (Davidson, 32 Cal. 3d at 209) has been identified in the first instance. The Court finds that the circumstances of the present case demonstrate no such outrageous behavior, and BANA is entitled to summary judgment as to Plaintiff's Eighth Claim for Relief.

**G.     Plaintiff has not Established any TCPA Violation**

The TCPA prohibits any person from placing autodialed calls to cell phones absent the express prior consent of the called party. 47 U.S.C. § 227(b)(1)(A); Meyer v. Portfolio Recovery Assoc., LLC, 707 F.3d 1036, 1043 (9th Cir. 2012). Plaintiff alleges that BANA violated the TCPA when it placed autodialed calls to her cell phone numbers ending in -8550 and -2448. FAC, ¶¶ 16, 52-58. Because the evidence reflects that only manual calls were to Plaintiff's two cell phones, and since the statute express requires that calls be made on an autodialer in order to trigger liability, Plaintiff's TCPA claim necessarily fails.

Within the applicable four-year limitations period (see 28 U.S.C. § 1658(a)), BANA placed calls to the -8550 number between January 2013 and May 2016 (SUF No. 32), and to the number ending -2448 between August 2014 and December 2016.[7] Id. at No. 35. BANA's Home Base calls log system lists the relevant calls as "manual," not "dialer" calls, and each manual entry lists the individual who placed the call. Id. at No. 29. There is no evidence beyond mere speculation[8] that any call to either of Plaintiff's numbers was placed using an autodialer, as required by the TCPA. 47 U.S.C.

///

---

[7] Significantly, too, and in any event, during the course of receiving written Requests for Mortgage Assistance from Plaintiff, BANA obtained written consent from Plaintiff to call both numbers in 2012. SUF Nos. 31, 33.

[8] Plaintiff suggests, for example, that because she heard "clicks" and "beeps" when answering calls from BANA, a disputed question of fact arises with respect to whether an autodialer was used. See Pl.'s Opp. ECF No. 59, 21:1-9. That is no more than speculation, however, and speculation alone cannot create a triable issue of fact precluding summary judgment. Richards v. Nielsen Freight Lines, 602 F. Supp. at 1244-45.

19

§ 227(b)(1)(A). BANA is therefore entitled to summary judgment as to Plaintiff's TCPA claim.[9]

**CONCLUSION**

Based on the foregoing, Defendant BANA's Motion for Summary Judgment (ECF No 49) is DENIED with respect to Plaintiff's Second Claim for Relief, for violation of California's Rosenthal Act, but otherwise is GRANTED. Defendant BANA's Motion for Sanctions as to Rule 11 for Plaintiff's failure to dismiss her TCPA claim (ECF No. 51) is also GRANTED, and sanctions in the amount of $1,500.00 are assessed jointly and severally against Plaintiff and her counsel and must be paid to BANA's counsel of record not later than thirty (30) days after this Memorandum and Order is electronically filed.

IT IS SO ORDERED.

Dated: April 6, 2020

MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE

---

[9] After filing the instant motion for summary judgment, BANA filed an additional Motion for Sanctions under Rule 11 on June 26, 2019. ECF No. 51. That Motion was predicated on Plaintiff's failure to dismiss her TCPA claim as factually unsupported despite numerous requests that she do so. The evidence shows, for example, that BANA's counsel wrote two letters requesting dismissal and citing the lack of any evidence that an autodialer was used to call Plaintiff. See April 30, 2019 and May 5, 2019 letters attached to the Reidy Decl., ECF No. 49-2, at pp. 78-81, 89-92. The only response from Plaintiff's counsel was an email citing a February 20, 2015 letter from previous counsel instructing BANA to "immediately cease and desist all collection activity." Id. at 83-87. As BANA pointed out in response, however, that demand has nothing to do with whether calls were made by an autodialer as the TCPA requires to trigger liability. In addition, Plaintiff failed to file any opposition to BANA's Motion for Sanctions, despite BANA's own filing of a Statement of Non-Opposition. ECF No. 56. Under those circumstances, the Court believes sanctions for Plaintiff's continuing failure to dismiss her TCPA claim and to force Plaintiff to file for summary judgment as to that claim is appropriate. BANA's Motion (ECF No. 51) will accordingly be GRANTED and the Court has determined that sanctions in the amount of $1,500.00 against Plaintiff and her counsel are proper after considering all the evidence.

20